653 S.E.2d 660

Terry R. MACE and Donald Mace,
Plaintiffs Below, Appellants

v.

FORD MOTOR COMPANY, a Delaware
corporation; Liberty Mutual Insurance
Company, Inc., a Massachusetts corpo-
ration; and Bert Wolfe Ford, Inc., a
West Virginia corporation, Defendants
Below, Appellees.

No. 33080.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 10, 2007.

Decided May 25, 2007.

J. Miles Morgan, Esq., Charleston, WV, Edgar F. Heiskell, III, Esq., Michie, Hamlett, Lowry, Rasmussen & Tweel, Charlottesville, VA, for appellants.

Andrew L. Paternostro, Esq., Bell & Bands, Charleston, WV, for appellee Bert Wolfe Ford, Inc.

Ancil G. Ramey, Esq., Steptoe & Johnson, Barbara J. Keefer, Esq., MacCorkle, Lavender, Casey & Sweeney, Charleston, WV, for appellee Liberty Mutual Insurance Company, Inc.

PER CURIAM.

In this appeal from the Circuit Court of Kanawha County, we are asked to review a summary judgment order dismissing a negligent spoliation lawsuit against an insurance company.

As set forth below, we affirm the circuit court's order.

I.

On February 4, 2002, appellant (and plaintiff below) Terry Mace was injured in a single-vehicle accident when the 1994 Ford Explorer that she was driving went out of control and rolled over.[1] Ms. Mace's Explorer was insured by the appellee (and defendant below) Liberty Mutual Insurance Company, Inc. ("Liberty Mutual").

Within hours, Liberty Mutual was notified of the accident by Ms. Mace's husband, appellant Donald Mace. Thereafter, representatives for Liberty Mutual inspected the vehicle and determined it to be a total loss. The appellant executed documents giving Liberty Mutual ownership of the vehicle, and Liberty Mutual tendered to the Maces $7,775.25, the "book value" for the totaled Ford Explorer.

On April 11, 2002, Liberty Mutual sold the Explorer to a salvage company. The vehicle was apparently broken apart and sold for parts and scrap.

Almost two years after the accident, on January 30, 2004, the appellants filed the instant lawsuit against Ford Motor Company and Bert Wolfe Ford, Inc., asserting various product liability and negligence claims. The appellants alleged that the suspension of the Ford Explorer was defectively designed, causing it to be inherently unstable and to offer inadequate resistance to rollover.

The appellants then, apparently, discovered that the prosecution of their product liability lawsuit was impaired because some of the suspension parts on the Ford Explorer had been removed by the salvage yard company, at some point after Liberty Mutual had disposed of the vehicle. Accordingly, on February 13, 2004, the appellants amended their complaint to include a claim against appellee Liberty Mutual, alleging the negligent spoliation of the suspension on the vehicle.

The appellants settled their claims against Ford Motor Company and Bert Wolfe Ford for $50,000.00, and then proceeded with their negligent spoliation claim against Liberty Mutual.

After the completion of discovery, the parties filed competing motions for summary judgment on the issue of liability. Liberty Mutual asserted that the appellants had failed to establish a triable issue of fact concerning the tort of negligent spoliation. Specifically, Liberty Mutual argued that when the Ford Explorer was sold to the salvage yard, there was no evidence that the appellants had filed or were contemplating filing a civil action, or that Liberty Mutual knew of the existence of such a pending or potential civil action.

The appellants argued that the evidence developed during discovery clearly showed

---

**1.** There is some evidence in the record to suggest that the interstate highway on which Ms. Mace was traveling was covered in ice and snow. Ms. Mace appears to have swerved sharply to miss another vehicle, in the process striking a guardrail, before the Explorer began rolling.

that Liberty Mutual knew that the appellants had a potential lawsuit against Ford Motor Company. First, the appellants found documentation that Liberty Mutual had processed approximately 500 claims nationwide involving Ford Explorers in the ten years preceding Ms. Mace's accident. These claims were coded as the "upset" of Ford Explorers, which may or may not all be rollovers. These claims cost Liberty Mutual some $7 million (or approximately $14,000.00 per claim).

Furthermore, discovery revealed that on April 19, 2001—about nine months prior to Ms. Mace's rollover accident—Liberty Mutual had filed a subrogation action in a fatal Ford Explorer rollover case in Florida. Liberty Mutual's complaint against Ford Motor Company alleged product liability theories similar to those asserted by the appellants in their complaint. It appears, however, that this lawsuit was later dismissed without any payment to Liberty Mutual by Ford Motor Company.

The appellants argued to the circuit court that the prior payment of claims similar to the appellants' claim, and the filing of the lawsuit in Florida, demonstrated that Liberty Mutual had knowledge of the defective nature of the Ford Explorer, and its propensity to roll over in collisions. Appellee Liberty Mutual argued that, this evidence aside, there is nothing in the record to suggest that Liberty Mutual knew that Ms. Mace's rollover was caused by any alleged defect. More importantly, Liberty Mutual argued that there is absolutely nothing in the record suggesting that Liberty Mutual knew that the appellants intended to file a lawsuit against Ford Motor Company. Accordingly, Liberty Mutual argued it had no legal responsibility to conserve the Ford Explorer.

The circuit court agreed with Liberty Mutual, and in an order dated October 31, 2005, granted summary judgment dismissing the appellants' negligent spoliation claim. The circuit court concluded, *inter alia*, that no suit had been filed when the appellants conveyed their interest in the Ford Explorer to Liberty Mutual, and that the appellants never informed Liberty Mutual of their intent to file suit against Ford Motor Company. On

this record, the circuit court concluded that Liberty Mutual owed the appellants no duty to preserve the vehicle.

The appellants now appeal the circuit court's October 31, 2005 summary judgment order.

## II.

We are asked to review the circuit court's award of summary judgment in favor of appellee Liberty Mutual. We review a circuit court's summary judgment ruling under the standard announced in Syllabus Point 1 of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), which is as follows: "A circuit court's entry of summary judgment is reviewed *de novo*."

In reviewing summary judgment, this Court will apply the same test that the circuit court should have used initially, and must determine whether "it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). We defined a "genuine issue of fact" in Syllabus Point 5 of *Jividen v. Law*, 194 W.Va. 705, 461 S.E.2d 451 (1995):

> Roughly stated, a "genuine issue" for purposes of West Virginia Rule of Civil Procedure 56(c) is simply one half of a trialworthy issue, and a genuine issue does not arise unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. The opposing half of a trialworthy issue is present where the non-moving party can point to one or more disputed "material" facts. A material fact is one that has the capacity to sway the outcome of the litigation under the applicable law.

As with the circuit court, we "must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion," that is, the appellants. *Painter v. Peavy*, 192 W.Va. at 192, 451 S.E.2d at 758.

We keep these standards in mind in addressing the appellants' arguments.

### III.

■ In the seminal case of *Hannah v. Heeter*, 213 W.Va. 704, 584 S.E.2d 560 (2003), in Syllabus Point 5, Justice Maynard recognized "spoliation of evidence as a standalone tort when the spoliation is the result of the negligence of a third party, and the third party had a special duty to preserve the evidence." To establish this cause of action, in Syllabus Point 8 of *Hannah v. Heeter* the Court set forth the following six-factor test:

The tort of negligent spoliation of evidence by a third party consists of the following elements: (1) the existence of a pending or potential civil action; (2) the alleged spoliator had actual knowledge of the pending or potential civil action; (3) a duty to preserve evidence arising from a contract, agreement, statute, administrative rule, voluntary assumption of duty, or other special circumstances; (4) spoliation of the evidence; (5) the spoliated evidence was vital to a party's ability to prevail in the pending or potential civil action; and (6) damages. Once the first five elements are established, there arises a rebuttable presumption that but for the fact of the spoliation of evidence, the party injured by the spoliation would have prevailed in the pending or potential litigation. The third-party spoliator must overcome the rebuttable presumption or else be liable for damages.

The circuit court below concluded, *inter alia*, that the appellants failed to establish evidence of (1) the existence of a "pending or potential civil action" at the time the spoliation occurred; and (2) evidence that the alleged spoliator had actual knowledge of the pending or potential civil action.

■ The appellants argue that the circuit court misconstrued the first standard in Syllabus Point 8 of *Hannah v. Heeter* by requiring the appellants to show a "pending or *impending* " civil action. The appellants argue that this was a higher standard of proof than the showing of a "pending or *potential* " civil action as was required by *Hannah v. Heeter*.

*Black's Law Dictionary* defines "pending" as:

Begun, but not yet completed; during; before the conclusion of; prior to the completion of; unsettled; undetermined; in process of settlement or adjustment. Thus, an action or suit is "pending" from its inception until rendition of final judgment.

*Black's Law Dictionary* at 1021 (5th Ed.1979). *Black's Law Dictionary* further defines "potential" in a quite distinguishable manner:

Existing in possibility but not in act. Naturally and probably expected to come into existence at some future time, though not now existing[.]

*Id.* at 1052.

The appellants assert that the term "impending" chosen by the circuit court is interchangeable with the term "pending" that is set forth in *Hannah v. Heeter*. For instance, *Webster's Third New International Dictionary* defines "impending" as an adjective meaning "about to occur; imminent."

The appellants contend that, by applying the incorrect legal standard, the circuit court essentially required the appellants to show they had filed suit at the time Liberty Mutual's alleged negligent spoliation occurred. In so doing, the appellants contend that the circuit court ignored the standard in *Hannah v. Heeter* that a plaintiff could also succeed by showing a "potential" civil action at the time of the spoliation. Because of this error, the appellants argue that the circuit court's order must be reversed.

Appellee Liberty Mutual responds that the circuit court's use of the term "impending" does not mean that the circuit court's analysis of the evidence of record was incorrect. Instead, Liberty Mutual asserts that the appellants probably never formed an intent to file suit against Ford Motor Company until sometime after the spoliation to the Ford Explorer occurred, and certainly never informed Liberty Mutual of their intent to sue.[2] On this record, Liberty Mutual asserts that the circuit court's decision is correct.

A quick examination of the circuit court's order confirms the appellants' claim that,

---

**2.** In her discovery deposition, appellant Ms. Mace was asked the following:

Q. Did you ever tell Liberty that you were going to sue Ford?

indeed, the circuit court did incorrectly state that the appellants' claim could be rejected if they had failed to show there was a "pending or impending case at the time the [appellants] sold their vehicle to Liberty." However, while the circuit court chose the wrong phrasing for the legal standard it was to follow, other parts of the order indicate that the circuit court nonetheless applied the correct standard. The circuit court later concluded that, when the alleged spoliation occurred, the appellants had neither "filed suit against Ford" nor formed, demonstrated or declared "any intention to file suit against Ford in the future."

■ After carefully reviewing the evidence of record, we find nothing to show, at the time of Liberty Mutual's alleged negligent spoliation of the evidence important to the appellant's claim against Ford, that the appellants had actually filed such a claim. More importantly, we see nothing in the record objectively demonstrating, in February 2002, the possibility that the appellants were likely to pursue a claim against Ford in the future. Put simply, at the time the alleged negligent spoliation occurred, there was no "pending or potential civil action" as contemplated by *Hannah v. Heeter, supra.* Accordingly, we find no error warranting reversal of the circuit court's order on this point.

■ The second reason underlying the circuit court's summary judgment order is the second of the six factors in *Hannah v. Heeter,* namely whether "the alleged spoliator had actual knowledge of the pending or potential civil action." The court found that "the evidence is undisputed that Liberty had no 'actual notice' of any pending or potential civil action at the time it acquired the subject vehicle from the Plaintiffs and sold it for salvage."

The parties are in agreement that the appellants never gave a direct and explicit notice to Liberty Mutual regarding the possibility of their filing a product-liability lawsuit over the spoliated Ford Explorer.[3] Instead, the appellants argue that Liberty Mutual was on notice of the existence of a potential lawsuit by the appellants because of two facts: (1) Liberty Mutual had paid some 500 claims costing $7 million involving Ford Explorers involved in "upset" claims, which included rollover claims; and (2) Liberty Mutual had filed its own product-liability lawsuit against Ford Motor Company, seeking subrogation damages involving the rollover of a Ford Explorer. Because Liberty Mutual, as a corporate entity, had some knowledge of the allegedly-defective nature of Ford Explorers; of the propensity for Ford Explorers to roll over in collisions; of the existence of product-liability lawsuits about Ford Explorers; and of the fact that the appellants' Ford Explorer had been destroyed in a rollover, the appellants argue that Liberty Mutual was on notice of the potential lawsuit by

---

A. No, at that point, I didn't even realize that there were—you know, I hadn't researched anything, didn't know anything about the product to even go that route.

3. The evidence of record is quite clear that the appellants waited until long after spoliation to the Ford Explorer occurred before giving any hint to Liberty Mutual that they intended to file a product liability lawsuit. Liberty Mutual concedes in its brief to this Court that, had the appellants informed Liberty Mutual of their intent to sue, arrangements could have been made to preserve the vehicle:

If the Maces had told Liberty, "We have filed a lawsuit against Ford," it [Liberty Mutual] would have known that the vehicle had evidentiary value and arrangements could have been made for its preservation. If the Maces had told Liberty, "We intend to file suit against Ford," likewise, it would have known the vehicle had evidentiary value.

Instead, the appellants conceded that they gave Liberty Mutual no direct notice. As appellant Mr. Mace answered in his deposition:

Q. Okay. Did you, when you reported the incident to Liberty Mutual, ask them to retain the vehicle for you in any way?
A. No, ma'am.
Q. At any time while Liberty was processing your collision claim and paying you for the vehicle, did you ask them to preserve the vehicle for you?
A. No, ma'am
Q. At any time in your dealings with Liberty Mutual about the collision claim on your Explorer, did you tell any representative of Liberty Mutual that you were going to sue Ford?
A. No, ma'am.
Q. Did you even tell a representative of Liberty Mutual that you were thinking about suing Ford?
A. No, ma'am.

the appellants. Accordingly, the appellants contend that Liberty Mutual should have preserved their Ford Explorer.

Appellee Liberty Mutual responds by arguing that *Hannah v. Heeter* requires a showing of *actual* knowledge of a pending or potential claim, not *constructive* knowledge. The appellee asserts that the circuit court correctly found that the evidence cited by the appellants constituted, at best, constructive notice by Liberty Mutual that the appellants might have had a claim against Ford Motor Company. Furthermore, the appellee cites to the circuit court's conclusion that " 'constructive notice' that there *may* or *might* be a cause of action is insufficient to give rise to a third-party's duty to preserve evidence." The appellee argues that the circuit court correctly applied the law and granted summary judgment against the appellants, because the appellants failed to give Liberty Mutual actual knowledge of their pending or potential claim.

■■■ We made it clear in *Hannah v. Heeter* that, in order for a plaintiff to successfully pursue a claim against a third party for negligent spoliation of evidence, the plaintiff must show that the third party had actual knowledge, from whatever source, of the plaintiff's pending or potential lawsuit. As we stated:

> We emphasize that a third party must have had *actual* knowledge of the pending or potential litigation. "[A] third party's constructive notice of a pending or potential action is not sufficient to force upon the third party the duty to preserve evidence."

*Hannah v. Heeter*, 213 W.Va. at 714, 584 S.E.2d at 570, *quoting Smith v. Atkinson*, 771 So.2d 429, 433 (Ala.2000).

The textbook definitions of "actual" and "constructive" knowledge and notice are helpful guides in assessing the state of a third party's knowledge and notice of pending or potential litigation.

On the one hand, *Black's Law Dictionary* defines "actual knowledge" as "direct and clear knowledge, as distinguished from constructive knowledge," *Black's Law Dictionary* at 888 (8th Ed.2004), and defines "actual notice" as "[n]otice given directly to, or received personally by, a party." *Id.* at 1090.

On the other hand, "constructive knowledge" is defined by *Black's Law Dictionary* as "[k]nowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." *Id.* at 888 (8th Ed.2004). Similarly, "constructive notice" is defined as "[n]otice arising by presumption of law from the existence of facts and circumstances that a party had a duty to take notice of ...; notice presumed by law to have been acquired by a person and thus imputed to that person." *Id.* at 1090.

■■■ A party's precise knowledge or state of mind concerning a situation often cannot be determined by direct evidence, but must instead be shown indirectly through circumstantial evidence. *See, e.g., Hinerman v. Daily Gazette Co., Inc.*, 188 W.Va. 157, 170 n. 18, 423 S.E.2d 560, 573 n. 18 (1992) ("a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence"); *Sias v. W–P Coal Co.*, 185 W.Va. 569, 575, 408 S.E.2d 321, 327 (1991) ("Subjective realization, like any state of mind, must be shown usually by circumstantial evidence[.]"); Syllabus Point 2, *Nutter v. Owens–Illinois, Inc.*, 209 W.Va. 608, 550 S.E.2d 398 (2001) (an employer's state of mind "must ordinarily be shown by circumstantial evidence, from which conflicting inferences may often reasonably be drawn."); *State ex rel. Erie Ins. Property & Cas. Co. v. Mazzone*, 218 W.Va. 593, 598, 625 S.E.2d 355, 360 (2005) ("Bad faith is a state of mind which must be established by circumstantial evidence.").

This Court has, on several prior occasions, recognized that the knowledge and mind-set of an artificial legal entity like a corporation is often difficult to fathom. Cases involving insurance companies like the appellee usually arise as a result of "corporate bureaucracy that has pushed some victim into a red-tape limbo." *TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 475, 419 S.E.2d 870, 888 (1992).

> This [insurance company] bureaucracy is neither inherently good nor inherently evil, and it performs a necessary function in the insurance industry. Nonetheless, the claims settlement bureaucracy is subject to

the same dynamics as every other bureaucracy known to man: its natural tendency is to maximize upward mobility for middle management members of the bureaucracy and to augment the work that the bureaucracy is responsible for doing. In government, this phenomenon is often referred to as "turf protection." The extent to which pernicious dynamics prevail in any particular company's claims bureaucracy differs from company to company and from office to office within the same company.

*Hayseeds, Inc. v. State Farm Fire & Cas.,* 177 W.Va. 323, 328, 352 S.E.2d 73, 78 (1986).

The evidence of record in the instant case-the numerous "upset" paid claims involving Ford Explorers and the Liberty Mutual product liability lawsuit—would, examined at one point in time in the absence of a corporate bureaucracy, be suggestive of direct and clear, and therefore "actual," knowledge by Liberty Mutual that some of its policyholders might have potential product liability claims against Ford Motor Company. However, hindsight is, as they say, 20–20. There is nothing in the record indicating that Liberty Mutual had ever, prior to conducting discovery in this case, as a corporate act examined its records and discovered a pattern of rollover accidents involving Ford Explorers. Likewise, there is nothing in the record articulating the decision-making process behind Liberty Mutual's decision to file—and later abandon—its product-liability lawsuit against Ford Motor Company in Florida. A jury therefore could only speculate whether that decision was generally a centralized corporate decision, or a random decision made by an individual employee at a local office. In sum, there is nothing in the record to demonstrate that Liberty Mutual had examined its records and reached a direct and clear recognition—that is, had actual knowledge—that Ford Explorers were defective.

Furthermore, the appellants concede that it was not until long after their Ford Explorer was altered that they gave notice of their civil action, or their intent to file a civil action, against Ford Motor Company directly to appellee Liberty Mutual. While, through the exercise of reasonable care or diligence, Liberty Mutual might have examined the facts and circumstances and concluded that the appellants had a potential claim, we see nothing to suggest that Liberty Mutual had a legal duty to do so. In the absence of such a legal duty, knowledge of the potential claim cannot be imputed to Liberty Mutual—that is to say, Liberty Mutual cannot be said to have even had constructive knowledge of the appellants' potential claim. Based upon this record, we find nothing suggesting that Liberty Mutual had clear and direct knowledge that the Ford Explorer driven by Ms. Mace was defective, or that any such defect was a cause of her injuries. It was therefore fair for the circuit court to find that Liberty Mutual did not have actual knowledge of the appellants' pending or potential lawsuit until February 2004, nearly two years after the appellant's rollover.

## IV.

Accordingly, the circuit court's October 31, 2005 summary judgment order must be affirmed.

Affirmed.