# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**January 2015 Term**

_____

**No. 14-0212**

_____

**FILED**
**March 2, 2015**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**JANNELL WILLIAMS, as the**
**Personal Representative of the Estate of Kenneth Williams, and**
**CHERYL RUTLEDGE, as the**
**Personal Representative of the Estate of Quentin Rutledge,**
**Plaintiffs Below, Petitioners**

**v.**

**WERNER ENTERPRISES, INC.,**
**a Nebraska Corporation,**
**Defendant Below, Respondent**

_____

**Appeal from the Circuit Court of Ohio County**
**The Honorable Martin J. Gaughan, Judge**
**Civil Action No. 09-C-419**

**AFFIRMED**

_____

**Submitted: February 11, 2015**
**Filed: March 2, 2015**

Frank P. Bush, Jr., Esq.                    Mary H. Sanders, Esq.
Law Office of Frank P. Bush, Jr.            Cindy D. McCarty, Esq.
Elkins, West Virginia                       Huddleston Bolen LLP
and                                          Charleston, West Virginia
Christopher J. Heavens, Esq.                Counsel for the Respondent
Heavens Law Offices
Charleston, West Virginia

**JUSTICE KETCHUM delivered the Opinion of the Court.**

**JUSTICE BENJAMIN concurs and reserves the right to file a separate opinion.**

**CHIEF JUSTICE WORKMAN dissents and reserves the right to file a separate opinion.**

**JUSTICE DAVIS dissents and reserves the right to file a separate opinion.**

SYLLABUS BY THE COURT

1.     "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."  Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

2.     "Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove."  Syllabus Point 2, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995).

3.     "Intentional spoliation of evidence is defined as the intentional destruction, mutilation, or significant alteration of potential evidence for the purpose of defeating another person's recovery in a civil action."  Syllabus Point 10, *Hannah v. Heeter*, 213 W.Va. 704, 584 S.E.2d 560 (2003).

4.     "The tort of intentional spoliation of evidence consists of the following elements: (1) a pending or potential civil action; (2) knowledge of the spoliator of the pending or potential civil action; (3) willful destruction of evidence; (4) the spoliated evidence was vital to a party's ability to prevail in the pending or potential civil action; (5) the intent of the spoliator to defeat a party's ability to prevail in the pending or potential civil action; (6) the party's inability to prevail in the civil action; and (7) damages. Once the first six elements are established, there arises a rebuttable

i

presumption that but for the fact of the spoliation of evidence, the party injured by the spoliation would have prevailed in the pending or potential litigation. The spoliator must overcome the rebuttable presumption or else be liable for damages." Syllabus Point 11, *Hannah v. Heeter*, 213 W.Va. 704, 584 S.E.2d 560 (2003).

Justice Ketchum:

The tort of intentional spoliation of evidence requires a plaintiff to prove that a defendant had "knowledge" of a pending or potential civil action, at the time that the defendant disposed of evidence vital to the plaintiff's action.

In this appeal from the Circuit Court of Ohio County, the circuit court granted summary judgment and dismissed two plaintiffs' claims that the defendant intentionally spoliated evidence vital to a product liability action by the plaintiffs. The circuit court determined that there was no indication whatsoever in the record to establish the defendant knew of any pending or potential civil action when it disposed of the evidence.

After a review of the record, we affirm the circuit court's summary judgment order.

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

Defendant Werner Enterprises ("Werner") is a nationwide freight transportation company. Quentin Rutledge and Kenneth Williams were long distance drivers for Werner who drove a tractor-trailer as a team.

In the early morning hours of January 12, 2009, sometime around 2:30 a.m., Mr. Rutledge was driving northbound on I-79 near Jane Lew, West Virginia. Mr. Williams was located in the tractor-trailer's sleeper berth. A winter storm began, and a police report indicates that the roadway was covered in snow. As Mr. Rutledge crossed a

1

bridge he lost control of the tractor-trailer. The vehicle hit a guardrail, jackknifed, overturned, then went off the road and slid 30 feet down a steep embankment.

Witnesses who arrived on the scene discovered a small fire had started that could not be extinguished. The fire eventually consumed the tractor-trailer. Mr. Rutledge and Mr. Williams died before they could be extracted.

By 5:30 a.m., Werner had hired an adjuster from Crawford & Company, a national adjusting firm. The adjuster arrived at the scene of the accident shortly thereafter and gathered information. The adjuster electronically provided Werner a written report and photographs on the day of the accident. The adjuster also called Werner and discussed the scene.

The adjuster informed Werner that this was a single-vehicle accident, caused by weather conditions, which involved only the two Werner employees. Hence, Werner (a Nebraska company) knew that it would be responsible (under Nebraska law) to pay workers' compensation death benefits to the drivers' families. Under Nebraska workers' compensation law, Werner was required to pay the benefits regardless of who was at fault for the accident; in return, Werner was immune from tort liability to the drivers' families for any tort damages.[1]

---

[1] Nebraska law (specifically Neb. Rev. Stat. §§ 48-111 and 48-148) provides that workers' compensation benefits are the exclusive remedy for any employee who suffers a personal injury that arises out of and in the course of his or her employment. *See, e.g.*, *Skinner v. Ogallala Pub. Sch. Dist. No. 1*, 262 Neb. 387, 394, 631 N.W.2d 510, 520 (2001) ("Indeed, the Nebraska Workers' Compensation Act is an employee's exclusive remedy against an employer for an injury arising out of and in the course of employment."); *Marlow v. Maple Manor Apartments*, 193 Neb. 654, 659, 228

(continued . . .)

2

The adjuster also told Werner that there were two other potential "claimants" from the accident. The first was the State of West Virginia. The adjuster stated that Werner would likely receive from the State a claim for damage done to the guardrail, for the cost of cleaning up diesel fuel spilled from the tractor-trailer, and for the removal of any hazardous substances left behind from the burning of the cargo and equipment.[2] The second potential claimant was the owner of the cargo. The adjuster thought there might be some scrap value that could be salvaged from the cargo, but also

N.W.2d 303, 306 (1975) ("If coverage exists, even though for some reason compensation may not be payable, the Workmen's Compensation Act is exclusive. If the accident does not arise out of and in the course of the employment, there is no coverage, and the parties then are not subject to the act.").

Furthermore, Nebraska's workers' compensation law only allows an action by an employee against an employer or co-worker if the employee's "injury or death is proximately caused by the willful and unprovoked physical aggression of such employee, officer, or director." Neb. Rev. Stat. § 48-111. *Compare* W.Va. Code § 23-4-2 [2005] (permitting lawsuit in addition to workers' compensation benefits where "injury or death result to any employee from the deliberate intention of his or her employer to produce the injury or death," and giving an expansive definition to "deliberate intention"); Syllabus Point 2, *Mayles v. Shoney's, Inc.*, 185 W.Va. 88, 405 S.E.2d 15 (1990) ("A plaintiff may establish 'deliberate intention' in a civil action against an employer for a work-related injury by offering evidence to prove the five specific requirements provided in W.Va.Code § 23-4-2(c)(2)(ii) (1983).").

[2] The report of the adjuster states:

There will be a claim made by the State of West Virginia for damage done to the guard rail and for the cost of cleaning up the hazardous substances left behind by the diesel spill and fire of the cargo and equipment. The WV Dept. of Environmental Protection was scheduled to arrive at the scene within the hour after we were released from the scene.

3

thought that the cost to handle and transport the scrap materials would exceed its scrap value. The adjuster therefore deemed the cargo a total loss.[3]

The only question remaining for Werner was whether the vehicle was repairable, or had any scrap value. The record indicates that by 3:15 a.m., while the tractor-trailer was still on fire, several heavy-duty tow trucks had arrived at the accident scene. Cables were attached to stabilize the tractor-trailer wreckage and prevent it from sliding further down the steep hill. The tow trucks later lifted the wreckage to allow removal of the bodies of Mr. Rutledge and Mr. Williams. For the remainder of the day – until approximately 9:00 p.m. – 15 employees of the towing company loaded five dump and/or flatbed trailers with the remains of the tractor-trailer. Because the local dump was closed at night, the remains of the tractor-trailer were hauled to the towing company's garage.

At some point within 48 hours of the accident, the assistant director of Werner's fleet maintenance program reviewed photos of the fire-burned tractor-trailer and immediately decided it was damaged beyond repair. Werner directed the towing

---

[3] The report of the adjuster states:

As is shown by the photographs the cargo on this truck consisted of a mixed load. From what we saw there were BB guns, custom aluminum wheels, flat screen TVs, hair products, two mopeds, and various adult novelties. The cargo was totally consumed by the fire. There was some salvage value in the wheels but the current [scrap] value of aluminum is $.30 and the cost to handle and transport would exceed return. We would deem the cargo a total loss.

4

company to dispose of the wreckage of the tractor-trailer. The towing company then hauled the wreckage to a local landfill.

Approximately one month after Werner disposed of the remains of the tractor-trailer, on February 11, 2009, a lawyer retained by Mr. Williams's family wrote a letter to Werner. The lawyer said he had been hired to investigate the January 12th accident, and said the purpose of the letter was "to request preservation of the vehicle and all evidence associated with the accident." Werner received the letter by certified mail on February 18th.

Within a week of receiving the letter, general counsel for Werner advised the lawyer by telephone that the vehicle had been disposed of, and in a letter dated March 4th general counsel clarified that the remains of the vehicle had been hauled to a landfill.

On December 9, 2009, the plaintiffs (the family of Mr. Williams, later joined by the family of Mr. Rutledge)[4] filed the instant lawsuit. The plaintiffs alleged a hodgepodge of legal theories, including that Werner acted with deliberate intent in violation of West Virginia's workers' compensation law; that Werner had negligently

---

[4] The initial complaint was filed by Jannell Williams, as the personal representative of the Estate of Kenneth Williams, against various defendants including Cheryl Rutledge, as the personal representative of the Estate of Quentin Rutledge. Ms. Williams alleged, in part, that Mr. Rutledge (as driver of the tractor-trailer) negligently caused or contributed to Mr. William's death. After various answers, cross-claims, counter-claims, and dismissals, Cheryl Rutledge was re-aligned as a plaintiff against Werner Enterprises, Inc.

5

trained and supervised the plaintiffs; and that Werner had caused the wrongful death of the plaintiffs.[5]

Among the various causes of action asserted by the plaintiffs, only two are relevant to this appeal. First, the plaintiffs asserted product liability claims against the manufacturer of the tractor-trailer, Freightliner Corporation, Inc. (and its parent corporation, Daimler Trucks North America, LLC). Second, the plaintiffs alleged that Werner had either negligently or intentionally spoliated and "disposed of evidence related to the subject accident, including the aforementioned Freightliner vehicle, with the knowledge of plaintiff[s'] request that such evidence be preserved[.]"

At a hearing on October 7, 2011, counsel for Freightliner asked the circuit court for summary judgment on the plaintiffs' product liability claims. Counsel for the manufacturer argued that the plaintiffs were unable to establish any product defect that caused the fire in the Werner tractor-trailer. Freightliner's counsel argued, based upon discussions with expert witnesses,

> that there are multiple potential causes for this fire, and due to the inability to inspect the vehicle itself, they are unable to arrive at any opinions that would be admissible in a court of law.

---

[5] The plaintiffs also brought suit against Crawford & Company (and its adjuster-employee, Mark Griffith). The plaintiffs alleged that Crawford & Company had engaged in either negligent and/or intentional spoliation when it worked with Werner to dispose of the tractor-trailer. The record on appeal suggests that Crawford & Company settled with the plaintiffs and was dismissed from the action.

The plaintiffs' attorneys conceded that summary judgment was proper because "the vehicle was destroyed within 48 hours" by Werner, and because the "few photographs that were taken were both of poor quality and failed to depict the areas . . . that our design engineer would need to be able to look at . . . to establish a specific defect." Accordingly, the circuit court granted summary judgment to Freightliner (and its parent corporation, Daimler Trucks). The plaintiffs did not appeal that summary judgment order.

At the same hearing, the circuit court heard a motion for summary judgment by Werner. Werner asked that all of the plaintiffs' claims be dismissed. However, in an order dated October 17, 2011, the circuit court granted only partial summary judgment to Werner, dismissing all but one of the plaintiffs' causes of action against Werner.

In its order, the circuit court dismissed the plaintiffs' claims that Werner was negligent in its training and supervision of Mr. Rutledge and Mr. Williams; that Werner had caused the wrongful death of Mr. Rutledge and Mr. Williams; and that Werner had, in violation of West Virginia workers' compensation law, caused injuries to and the death of Mr. Rutledge and Mr. Williams with deliberate intent. Additionally, the circuit court dismissed the plaintiffs' claim that Werner had *negligently* spoliated evidence.[6] The plaintiffs appealed the partial summary judgment order to this Court. In

---

[6] "West Virginia recognizes spoliation of evidence as a stand-alone tort when the spoliation is the result of the negligence of a third party, and the third party had a special duty to preserve the evidence." Syllabus Point 5, *Hannah v. Heeter*, 213 W.Va. 704, 584 S.E.2d 560 (2003).

a memorandum decision, we affirmed the circuit court's October 17, 2011, order. *See Williams ex rel. Williams v. Werner Enterprises, Inc.*, 2013 WL 3184845 (No. 12-0847, June 24, 2013).

The circuit court's partial summary judgment order dismissed all of the plaintiffs' claims except for one: whether Werner *intentionally* spoliated evidence when it disposed of the tractor-trailer. This ruling, favorable to the plaintiffs, was not appealed. The circuit court initially permitted the intentional spoliation claim to proceed to trial. However, out of caution the circuit court certified questions to this Court on June 15, 2012, concerning whether the plaintiffs had proffered sufficient evidence to establish a genuine issue of fact in their intentional spoliation claim against Werner. We refused to review the certified questions.

On December 30, 2013, Werner renewed its motion for summary judgment on the plaintiffs' intentional spoliation claim.[7] To establish Werner intentionally spoliated evidence to defeat the plaintiffs' product liability suit, the plaintiffs had to prove Werner had "knowledge . . . of the pending or potential civil action" against Freightliner

---

[7] The plaintiffs argue that the circuit court was precluded from addressing the motion for summary judgment on the intentional spoliation claim because (a) the circuit court's October 2011 order had denied summary judgment on the claim, and (b) this Court had "affirmed" the circuit court's order in a June 2013 memorandum opinion. We reject this argument because none of the parties appealed the circuit court's intentional spoliation ruling, and none of our reasoning in the June 2013 memorandum decision discussed or approved of the ruling. Hence, the circuit court was free to re-address its ruling on intentional spoliation if it felt "a need to correct a clear error or prevent manifest injustice." *Tolley v. Carboline Co.*, 217 W.Va. 158, 161 n.3, 617 S.E.2d 508, 511 n.3 (2005) (quoting Franklin D. Cleckley, Robin Jean Davis & Louis J. Palmer, *Litigation Handbook on West Virginia Rules of Civil Procedure*, § 56(c) (Supp.2004)).

8

at the time Werner decided to send the remains of the tractor-trailer to the landfill. Syllabus Point 11, in part, *Hannah v. Heater*, 213 W.Va. 704, 584 S.E.2d 560 (2003). Werner asserted that because there was no evidence suggesting Werner knew that the plaintiffs intended to sue Freightliner, summary judgment was proper.

In an order dated January 24, 2014, the circuit court granted Werner's motion for summary judgment. The circuit court could find nothing in the record suggesting "that Werner, prior to disposing of the subject vehicle in this case, had examined its records and reached a direct and clear recognition (actual knowledge) that Freightliner tractor-trailers were defective." Because there was no material question of fact favorable to the plaintiffs on this critical point, the circuit court concluded that the plaintiffs could not establish their intentional spoliation claim.

The plaintiffs now appeal the circuit court's summary judgment order.

## II.
## STANDARD OF REVIEW

We give a *de novo* review to a circuit court's order granting summary judgment under Rule 56 of the WEST VIRGINIA RULES OF CIVIL PROCEDURE. Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). Accordingly, we apply the same standards that the circuit court relied upon in our review.

Under Rule 56 of the RULES OF CIVIL PROCEDURE, summary judgment is proper where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "A motion for summary judgment should be granted only when it is clear that there is no genuine

9

issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty and Surety Company v. Federal Insurance Company of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). "Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." Syllabus Point 2, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995).

Moreover, this Court has observed that, in reviewing an order granting a motion for summary judgment, any permissible inferences from the underlying facts must be drawn in the light most favorable to the party opposing the motion. *See Mueller v. American Electric Power Energy Services*, 214 W.Va. 390, 393, 589 S.E.2d 532, 535 (2003). Nevertheless, Syllabus Point 3 of *Williams v. Precision Coil, Inc.*, 194 W.Va. at 56, 459 S.E.2d at 333, holds:

> If the moving party makes a properly supported motion for summary judgment and can show by affirmative evidence that there is no genuine issue of a material fact, the burden of production shifts to the nonmoving party who must either (1) rehabilitate the evidence attacked by the moving party, (2) produce additional evidence showing the existence of a genuine issue for trial, or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f) of the West Virginia Rules of Civil Procedure.

With these standards in mind, we turn to the plaintiffs' challenge to the circuit court's summary judgment order dismissing their claim against Werner for intentional spoliation of evidence.

10

## III.
## ANALYSIS

"Intentional spoliation of evidence is defined as the intentional destruction, mutilation, or significant alteration of potential evidence for the purpose of defeating another person's recovery in a civil action." Syllabus Point 10, *Hannah v. Heeter*, 213 W.Va. 704, 584 S.E.2d 560 (2003). "The gravamen of the tort of intentional spoliation is the *intent to defeat a person's ability to prevail in a civil action*. Therefore, it must be shown that the evidence was destroyed with the specific intent to defeat a pending or potential lawsuit." 213 W.Va. at 717, 584 S.E.2d at 573. "West Virginia recognizes intentional spoliation of evidence as a stand-alone tort when done by either a party to a civil action or a third party." Syllabus Point 9, *Hannah*, 213 W.Va. at 708, 584 S.E.2d at 564.

This Court adopted a seven-factor test in *Hannah* governing claims of intentional spoliation of evidence. Those seven factors are (with emphasis on the factor at issue in this appeal):

> The tort of intentional spoliation of evidence consists of the following elements: (1) a pending or potential civil action; (2) *knowledge of the spoliator of the pending or potential civil action*; (3) willful destruction of evidence; (4) the spoliated evidence was vital to a party's ability to prevail in the pending or potential civil action; (5) the intent of the spoliator to defeat a party's ability to prevail in the pending or potential civil action; (6) the party's inability to prevail in the civil action; and (7) damages. Once the first six elements are established, there arises a rebuttable presumption that but for the fact of the spoliation of evidence, the party injured by the spoliation would have prevailed in the pending or potential

11

litigation. The spoliator must overcome the rebuttable presumption or else be liable for damages.

Syllabus Point 11, *Hannah*, 213 W.Va. at 708, 584 S.E.2d at 564.

This Court considered the meaning of the first factor – whether there was a pending or potential civil action – in *Mace v. Ford Motor Co.*, 221 W.Va. 198, 653 S.E.2d 660 (2007) (*per curiam*). We noted that the dictionary definition of "pending" is:

> Begun, but not yet completed; during; before the conclusion of; prior to the completion of; unsettled; undetermined; in process of settlement or adjustment. Thus, an action or suit is "pending" from its inception until rendition of final judgment.

221 W.Va. at 202, 653 S.E.2d at 664 (quoting *Black's Law Dictionary* (5th Ed. 1979)). We found the dictionary definition of "potential" was "quite distinguishable," and is this:

> Existing in possibility but not in act. Naturally and probably expected to come into existence at some future time, though not now existing[.]

*Id*. We concluded that a "pending or potential civil action" exists where the plaintiff has actually filed a claim, or where there is evidence objectively demonstrating the possibility that the plaintiff was likely to pursue a claim in the future. 221 W.Va. at 203, 653 S.E.2d at 665.

This appeal centers exclusively on the second factor of *Hannah*: the knowledge of the spoliator of a pending or potential civil action. The dispute in this case is over the degree of proof necessary to fairly say a spoliator "knew" of a pending or potential claim, and thereafter destroyed evidence to foil the plaintiff's pursuit of the claim.

12

The plaintiffs in this case contend there is substantial, uncontroverted evidence from which the only reasonable conclusion is that Werner had actual knowledge of the plaintiffs' claims requiring preservation of the tractor-trailer. Based on Werner's communication records, the plaintiffs assert Werner was aware that the tractor-trailer had broken down twice on the trip immediately preceding the trip encompassing the accident at issue.[8] Furthermore, the adjuster who visited the accident scene advised Werner of a significant diesel fuel leak and subsequent fire that consumed the tractor and trailer. On the day of the accident, Werner was aware that two of its employees had died in a severe accident. Werner was also aware it faced claims for damage to the guardrail and for environmental remediation. Additionally, the cargo in the trailer was a total loss.

The plaintiffs further assert that Werner is a sophisticated trucking entity that has an in-house legal department and a claims department that is well versed in litigation arising from trucking accidents.

Putting these facts together, the plaintiffs contend that on the same day as the accident, Werner "knew" that numerous potential claims existed. These claims included (1) claims by the plaintiffs for negligent maintenance of the tractor-trailer; (2) product liability claims by the plaintiffs against the manufacturer of the Freightliner

---

[8] Aside from Werner's communication logs, the record contains no other information about these alleged breakdowns. The log entry, on January 9, 2009, says only this: "1306 each added to current trip for both breakdowns." The plaintiff has provided nothing to suggest what part of the tractor-trailer was involved, the cause of the breakdowns, who did the repairs (if any), the extent to which Werner was aware of the breakdowns or repairs, or – most importantly – how these breakdowns may have caused or contributed to the January 12th accident.

tractor-trailer; (3) subrogation claims by Werner (or its insurers) for workers' compensation payments made to the plaintiffs' survivors; and (4) subrogation claims by Werner for amounts spent on the lost cargo and property damage. Still, within 48 hours of the accident Werner approved the disposal of the tractor-trailer in a landfill.

Werner argues that the facts laid out by the plaintiffs are nothing more than a case for "constructive" knowledge, not "actual" knowledge. Werner contends that on the day of the accident, January 12th, no pending or potential claims required the preservation of the tractor-trailer. The investigations by a sheriff's deputy and by Werner's adjuster showed the accident resulted exclusively from snow and ice on the roadway.[9] The carcass of the vehicle was irrelevant to the outcome of the only potential claim from the plaintiffs that Werner knew of: the claim for Nebraska workers' compensation death benefits. Werner also knew that Nebraska's workers' compensation laws barred any negligence suits by the plaintiffs against Werner, including against Werner's maintenance department. The tractor-trailer was also irrelevant to any claims

---

[9] The report of the sheriff's deputy suggests that a rough road may also have contributed to the truck sliding on ice. The deputy's narrative says, in part (with capitalization removed):

> At approximately 0230 AM . . . the driver . . . lost control of this tractor trailer owned by Werner Enterprises while crossing an icy snow covered bridge . . . (the bridge was also bumpy from several attempts to patch holes on it) . . . This officer can only speculate that the cause of the accident was the snowy road conditions, and possibly the condition of the bridge.

14

that might be asserted by the State for the damage to the guardrail or the environmental damage, or asserted by the owner of the destroyed cargo.

Put simply, within 48 hours of the accident, Werner argues that the extent of its "actual" knowledge was that the tractor-trailer was a total loss, burned, in pieces, and sitting in five dump or flatbed trailers. Based on that knowledge, Werner authorized disposal of the vehicle.

It was not until over a month later, on February 18th, that Werner received a certified letter from the plaintiffs asking Werner to preserve the remains of the tractor-trailer. Hence, Werner claims it had no "actual knowledge" of any claims by the plaintiffs involving the tractor-trailer until this date. Since it had relinquished all possession, custody, and control of the vehicle to the towing company that then dumped the vehicle in a landfill, Werner asserts it had neither a right nor a duty to extract the remains of the vehicle for the plaintiffs. Additionally, Werner asserts the plaintiffs had just as much right to visit the landfill and attempt to inspect the remains of the tractor-trailer, but did not do so.

The circuit court and the parties proceeded below on the notion that, in an intentional spoliation suit, the plaintiff must prove the spoliator "had actual knowledge of the pending or potential litigation." On appeal, the parties again dispute whether the evidence is sufficient to suggest a question of material fact as to whether Werner had "actual" knowledge of the potential claims requiring preservation of the tractor-trailer.

Our scrutiny of the seven-factor test in Syllabus Point 11 of *Hannah v. Heeter*, as well as the text of *Hannah*, reveals no requirement of "actual" knowledge.

15

The tort of intentional spoliation requires only proof of "knowledge of the spoliator of the pending or potential civil action." Syllabus Point 11, *Hannah*.

In the common vernacular, knowledge is an awareness, familiarity or understanding of a fact or of a range of information. "As a general matter, *knowledge* requires awareness of a fact or condition[.]" Bryan A. Garner, *A Dictionary of Modern Legal Usage* 495 (1995). Digging deeper into epistemology, the Oxford English Dictionary defines knowledge as an "[a]cquaintance with a fact; perception, or certain information of, a fact or matter; state of being aware or informed; consciousness (of anything)." It is also defined as "knowledge of a person, thing, or perception gained through information or facts about it rather than by direct experience" and as an "[i]ntellectual acquaintance with, or perception of, fact or truth; clear and certain mental apprehension; the fact, state or condition of understanding." VIII *The Oxford English Dictionary* 517-18 (2nd Ed. 1991).

The Oxford English Dictionary indicates that many of the iterations of the word "knowledge" are "derived from the verb KNOW[.]" To "know" something means to "recognize or distinguish," "to acknowledge," and "to be acquainted with (a thing, a place, or a person)." More specifically, "to know" a fact is "[t]o have cognizance of (something) through observation, inquiry, or information; to be aware or apprised of . . . to become cognizant of, learn through information or inquiry, ascertain, find out." It is also "[t]o apprehend or comprehend as fact or truth; to have a clear or distinct perception or apprehension of; to understand or comprehend with clearness and feeling of certainty." VIII *The Oxford English Dictionary* at 512-515.

16

When opposing a motion for summary judgment, a party must show something more than a metaphysical doubt that there is a genuine issue of fact to be tried. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed. 2d 538 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). In the instant case, the plaintiffs assert that Werner is a sophisticated trucking company, and therefore that it should have known of the potential for a product liability lawsuit by the plaintiffs against Freightliner. However, we find no evidence to suggest that when Werner disposed of the tractor-trailer that it had any inkling of (let alone cognizance, awareness, a clear perception, or information that would impel it to inquire, ascertain, or find out about) a pending or potential product liability lawsuit, by the plaintiffs or anyone else. It is only with hindsight that the plaintiffs can justly say Werner "should have known."[10]

The first evidence that Werner had knowledge of the plaintiffs' potential product liability suit was on February 18, 2009, when they received a letter from a plaintiff's lawyer asking that the tractor-trailer be preserved. This is the primary evidence indicating that a Werner employee had an articulable awareness and understanding of a potential future suit. But this letter was received over a month after

---

[10] The circuit court noted in its summary judgment order that it was "disturbed with the conduct of Werner by quickly disposing of the subject vehicle under the circumstances." However, as with the plaintiffs, this opinion derives from the circuit court's view of the case in hindsight.

17

the remains of the tractor-trailer had been hauled to a landfill (in pieces loaded on dump and flatbed trailers) and after Werner was alleged to have "spoliated" evidence critical to the plaintiffs' case.

The plaintiffs' case is therefore staked on whether Werner, in the 48 hours after the accident, had knowledge of information that would lead it to inquire further, and to investigate and inquire whether the plaintiffs had some potential claim based upon the tractor-trailer. However, we can find no such evidence that should have impelled Werner to act differently. Within 48 hours of the accident, Werner understood that two of its employees had died in a horrific accident likely triggered by nothing more than snow and ice.[11] The tractor-trailer had plowed into and through a guardrail, jackknifed, rolled over, and then slid down a steep hillside before being consumed by fire. The vehicle was not towed from the site; it was hauled away in pieces, collected over 15 hours, on five dump and flatbed trailers.

The plaintiffs contend that Werner knew the tractor-trailer had mechanical difficulties which should have caused Werner to suspect a potential product liability action. However, the plaintiffs' only evidence of the mechanical difficulties is an abbreviated note in a communication log with Werner, which says simply, "1306 each added to current trip for both breakdowns." No other documentation or deposition testimony is in the record to describe the nature of these breakdowns, the cause of the

---

[11] The record also contains allusions that the drivers were inexperienced, with only four months of truck-driving experience.

18

breakdowns, who conducted the repairs, or how these mechanical problems in any way caused or contributed to the accident. Moreover, there is nothing to suggest these breakdowns were extraordinary, out of the routine, or indicative of a pattern such that Werner would have been aware of a potential product liability action.[12]

The plaintiffs also contend that Werner itself had various potential claims that should have triggered a more sedulous investigation. For instance, the on-scene adjuster hired by Werner noted potential claims might be filed by the State of West Virginia (for the guardrail and environmental damage) and by the owner of the destroyed cargo. The plaintiffs, however, do not explain why – when liability for these expenses was so clear – that Werner needed to preserve the tractor-trailer to defend either of these potential claims.

Furthermore, the plaintiffs assert that Werner should have perceived a potential claim by the plaintiffs against Freightliner so that Werner could recover subrogation of the workers' compensation death benefits paid to the plaintiffs' families, and recover subrogation for the lost cargo and environmental damage. However, to have perceived a claim for subrogation would have required Werner to first perceive that the

---

[12] As an example of a pattern of breakdowns, see *Appalachian Leasing, Inc. v. Mack Trucks, Inc.*, 765 S.E.2d 223, 226 (W.Va. 2014). The plaintiff in *Appalachian Leasing* bought four Mack trucks that were repeatedly driven or towed back to the dealership because they "(1) would not run, (2) hard to start, (3) transmission problems, (4) overheating, (5) leaking water pump, (6) hoods falling off and (7) cabs falling apart." *Id.* The plaintiff sought damages and sought to rescind the purchase contract because the four trucks failed in their essential purpose of being suitable for off-road coal hauling purposes.

plaintiffs were naturally and probably expected to bring a suit against Freightliner. We see no evidence of this latter fact.

We agree with the plaintiffs that Werner is a sophisticated entity, with on-staff lawyers familiar with trucking accidents. But, until Werner received the letter on February 18, 2009, we can see no evidence indicating Werner perceived or even suspected impending future litigation over tractor-trailer defects by the plaintiffs. All of the evidence of record suggests that when the tractor-trailer was hauled to the landfill, Werner knew only that the plaintiffs had claims for workers' compensation benefits. The remains of the tractor-trailer were irrelevant to that claim.

The tort of intentional spoliation is designed to preclude a party from destroying evidence with the intent to harm another party's ability to bring or defend a legal claim. But the tort is not intended to unduly interfere with the rights of individuals to dispose of their property lawfully. Because there is no evidence of record to say Werner was aware, informed, perceived, or had any knowledge that would lead it to the conclusion the plaintiffs had a pending or potential suit when it destroyed the tractor-trailer, the circuit court was correct in granting summary judgment.[13]

---

[13] Werner raises one cross-assignment of error, and asserts that under the choice-of-law doctrine *lex loci delicti*, Nebraska law and not West Virginia law should control this case. Nebraska has never recognized the tort of intentional spoliation of evidence. *See McNeel v. Union Pac. R. Co.*, 276 Neb. 143, 156, 753 N.W.2d 321, 332 (2008) ("In Nebraska, the proper remedy for [intentional] spoliation of evidence is an adverse inference instruction."); *State v. Davlin*, 263 Neb. 283, 302, 639 N.W.2d 631, 649 (2002) ("an instruction on the inference that may be drawn from spoliation of evidence is appropriate only where substantial evidence exists to support findings that the evidence had been in existence, in the possession or under the control of the party against

(continued . . .)

## IV.
## CONCLUSION

The circuit court correctly determined that there was no question of material fact as whether Werner had knowledge of the plaintiffs' potential claim when it disposed of the tractor-trailer. The circuit court's January 24, 2014, summary judgment order is therefore affirmed.

Affirmed.

---

whom the inference may be drawn; that the evidence would have been admissible at trial; and that the party responsible for the destruction of the evidence did so intentionally and in bad faith.").

Werner urges that we adopt the method of analysis outlined in the *Restatement (Second) of Conflict of Laws* § 145 (1971) to guide our choice of applicable law. However, we have specifically rejected the Section 145 analysis, largely because it is inherently subject to manipulation. Further, although Section 145 may have been designed as "a method of analysis that permitted dissection of the jural bundle constituting a tort and its environment," history has taught the Court that such schemes instead "produce protracted litigation and voluminous, inscrutable appellate opinions, while rules get cases settled quickly and cheaply." *Paul v. National Life*, 177 W.Va. 427, 432, 352 S.E.2d 550, 554 (1986).

This Court has, therefore, consistently applied the common-law "*lex loci delicti* choice-of-law rule; that is, the substantive rights between the parties are determined by the law of the place of injury." *McKinney v. Fairchild Int'l, Inc.*, 199 W.Va. 718, 727, 487 S.E.2d 913, 922 (1997). The tort of intentional spoliation of evidence is, in part, a procedural rule designed to protect local courts from the deliberate destruction of evidence necessary to prosecute claims. Because Werner's disposition of the truck occurred in West Virginia, and allegedly impinged upon the plaintiffs' prosecution of a West Virginia product liability injury suit, West Virginia's intentional spoliation rules govern this case.

21