COURT OF APPEALS OF VIRGINIA

Present:   Judges O'Brien, Causey and Bernhard
Argued at Fredericksburg, Virginia


LOAN FUNDER LLC, SERIES 715

v.        Record No. 0784-24-4

FARM LIFE, LLC

OPINION BY
JUDGE DORIS HENDERSON CAUSEY
JANUARY 20, 2026

FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Stephen E. Sincavage, Judge

F. Douglas Ross (Odin, Feldman, & Pittleman, P.C., on briefs), for
appellant.

Thomas K. Plofchan, Jr. (Jennifer M. Guida; Westlake Legal Group,
on brief), for appellee.


On April 12, 2024, the Circuit Court of Loudoun County entered an order quieting title to

certain real property owned by Farm Life, LLC, in favor of Farm Life.  The order also declared

void a deed of trust encumbering the property in favor of Loan Funder LLC, Series 715.[1]  The

deed of trust was security for a loan taken out by one of Farm Life's managers, which the

manager had obtained to fund a personal business venture without the knowledge or consent of

Farm Life's other managers and members.  Loan Funder appeals, arguing that the circuit court

misinterpreted the rules in Code § 13.1-1021.1(B) and (C) regarding unauthorized real property

transfers by LLC managers.  For the following reasons, we affirm the judgment of the trial court.

---

[1] The trial court also entered judgment in favor of Loan Funder on Farm Life's slander of
title claim and in favor of Loan Funder and three codefendants on Farm Life's claims for a
conspiracy to slander title.  Farm Life did not cross-appeal these rulings.

BACKGROUND[2]

Farm Life, LLC was organized in April 2013. Its original operating agreement provided that it would be governed by a board of five managers and have seven members, including all five managers. Each member owned a one-seventh share of the company.

One provision of Farm Life's operating agreement stated that certain "extraordinary matters" could not be taken except by the vote of members "holding at least 51% of the outstanding Percentage Interests entitled to vote." Among these matters was the act of "sell[ing] or transfer[ing] all or substantially all of the Company assets other than in the ordinary course of business."

Farm Life owned nearly 100 acres of real property in Hamilton, Virginia. Farm Life's corporate representative testified that this real property and the structures thereon constituted Farm Life's only substantial assets. Farm Life's business involved renting out its real property for various purposes including family reunions, parties, and corporate retreats. Farm Life also rented out stables on its property. In the long term, Farm Life intended to develop houses on its property, as well as a "venue."[3]

Farm Life never held itself out as engaged in any business other than the use of its own real property. Specifically, Farm Life never engaged in any business related to bakeries, nor in any operations in the state of Florida, and no evidence indicated it had ever held itself out as engaged in such.

---

[2] "According to well settled principles, we recite the relevant facts in the light most favorable to [Farm Life], . . . the prevailing party in the circuit court." *Agnew v. United Leasing Corp.*, 80 Va. App. 612, 619 (2024) (second alteration in original) (quoting *Nichols Constr. Corp. v. Va. Mach. Tool Co., LLC*, 276 Va. 81, 84 (2008)).

[3] At trial, information regarding Farm Life's business was provided by Farm Life's corporate representative and by a term sheet prepared by RCN, the initial lender in this case.

Zhongwei Lu, an attorney licensed in New York, was both a member and a manager of Farm Life. The evidence indicated that Lu was the only member of Farm Life who both read and spoke English proficiently.

On January 7, 2016, Lu applied for a $1.567 million loan with RCN Capital. On the loan application, Lu listed himself as the loan applicant and stated that the purpose of the loan was "[i]nvestment in Blue Coast Bakery." Lu listed Farm Life's Hamilton property as the property available as collateral for the loan and noted Farm Life's ownership of the property.

Blue Coast Bakery was a bakery project based in Florida in which Lu was personally involved. No evidence indicated that Farm Life ever had any relationship to Blue Coast Bakery, any other bakery business, or any business in Florida.

Lu applied for the loan without informing the other members or managers of Farm Life and without obtaining their permission. Lu did not inform Farm Life's members and managers of his actions until he had placed a deed of trust on Farm Life's real property, received the loan proceeds, sent money to fund the bakery project, and placed Farm Life in default on the loan.

RCN classified Farm Life, not Lu, as the loan applicant. Pursuant to RCN's practices, Lu was not permitted to be a sole guarantor for the loan and was required to obtain the consent of other Farm Life members, because he was not the majority owner of the borrower entity. Lu attempted to subvert RCN's requirements—and the majority-vote requirements within Farm Life's own operating agreement—by furnishing documents that falsely indicated that he possessed a majority ownership share of Farm Life.

On January 7 or 8, 2016, Lu submitted a purported operating agreement "amendment" dated December 10, 2015. The document stated that on that day, pursuant to a telephonic meeting, "the ownership of all outstanding memberships" in the company "have been distributed

and are now owned by Zhongwei Lu," giving Lu a 54% ownership in the company.[4]  In fact, as Lu acknowledged at trial, no such meeting ever occurred, and Lu was never transferred a majority ownership share of Farm Life.

RCN's counsel immediately noticed issues with the document.  The document contained mathematical errors, as it claimed that Lu's ownership share reached 54% after what it stated was an additional 44% ownership share was added to Lu's initial share of 14.29%.  Additionally, the document was signed only by Lu and by no other LLC members or managers.  Based on these facts, RCN's counsel concluded that Lu's amendment was "ineffective" and that unless the other members of Farm Life were to "get legitimately bought out, they will all need to guarantee the loan."

Within one day of being informed that RCN had rejected his amendment, Lu procured a new amendment to the operating agreement.  The new purported amendment corrected mathematical errors, contained signatures that were purportedly by all of Farm Life's members, including members located in China, and provided a purported explanation for the transfers.[5]  The loan broker (314 Capital Partners) and RCN's counsel accepted this document as satisfactory.  Later, RCN agreed to edit the loan term sheet such that only Lu was required to guarantee the loan.

---

[4] Lu testified that this document—and apparently all fraudulent documents used in this case—was prepared for him by a broker (a different broker from 314 Capital Partners, which is mentioned *infra*).  By the time of the trial in this case, the broker was deceased.  For the purposes of this appeal, the broker's degree of involvement is not at issue.  Therefore, we discuss the provision of these documents in reference solely to Lu.

[5] At trial, Lu invoked his Fifth Amendment right against self-incrimination when asked whether he signed the names of Farm Life's members on this purported amendment.  However, Lu also admitted that he was never actually made a majority-in-interest member of Farm Life.  Two Farm Life managers whose purported signatures appear on the document testified that they did not sign, or were not aware of, any amendment to the operating agreement.

Lu signed a commitment letter with RCN on January 27, 2016. On the commitment letter, Lu listed Farm Life as the borrower, and wrote, falsely, that he was signing as the "Majority in Interest Member." Lu, individually, was listed as a guarantor.

During the loan process, RCN produced a "term sheet" that noted, "Borrower is pulling cash out of subject property in order to invest in his bakery business." Lu testified that neither RCN nor Loan Funder, the entity that eventually took over the loan, ever asked Lu whether Farm Life was in the bakery business.

RCN's representative testified that "not much" investigation into Blue Coast Bakery was ever performed by RCN. He testified that RCN, as an asset-based lender, focused its inquiry on "the collateral itself." The representative testified that RCN attempted to account for the risk of fraud on this type of loan in part by charging higher interest rates.

After RCN received an attorney opinion letter attesting to the loan's validity, Lu signed the loan agreement, promissory note, and deed of trust in February 2016. Loan Funder soon took on the role of lender on Farm Life's loan and conducted its own independent review and underwriting.

The first loan payment came due in March 2017. In June 2017, Lu wrote to Farm Life to inform them that he had taken out the loan without Farm Life's consent, used the property as collateral, and that Farm Life was now in default on the loan. Farm Life subsequently moved to remove Lu as a manager.

In July 2018, Farm Life brought this suit against several parties including RCN and Loan Funder. Its third amended complaint was filed in March 2020. In one count, Farm Life asked the trial court to quiet title to its real property and to void the deed of trust, as well as certain other loan documents. In the second and third counts, Farm Life asserted claims of slander of title and civil conspiracy against multiple defendants including Loan Funder, RCN, and other

individuals involved in the loan application and underwriting process, some of whom were later dismissed from the case.

On March 12, 2024, after four days of trial and one day of arguments, the trial court ruled that title to the property would be quieted in favor of Farm Life. In support of this ruling, the trial court first found that Lu lacked actual authority to take out the loan. The court next found that because a Florida bakery was not related to the purpose of Farm Life's business, Lu was not "even apparently carrying on in the ordinary course of Farm Life's business, or the business of the kind carried on by Farm Life" when he encumbered the property. Therefore, the trial court ruled that under Code § 13.1-1021.1(B), Farm Life was not bound by Lu's actions in signing the deed of trust, and that the deed of trust[6] was therefore void. The trial court also ruled, however, that the promissory note could not be voided by the quiet title action.

Additionally, the trial court ruled that Farm Life had not met its burden to show slander of title and conspiracy. Finally, the trial court rejected Loan Funder's breach-of-note counterclaim, finding that Lu lacked the authority to bind Farm life in that contract.

The trial court entered its final order on April 12, 2024. This appeal followed.

ANALYSIS

On appeal, Loan Funder argues that the trial court erred when it held that Farm Life was not bound by the deed of trust. Loan Funder argues that the trial court erred in applying Code § 13.1-1021.1(B) rather than Code § 13.1-1021.1(C) to the facts of this case. Further, Loan

---

[6] The trial court also declared void a "collateral assignment of leases and rents." Because the analysis for purposes of this opinion does not differ, we refer to these instruments collectively as the "deed of trust."

Funder argues that the trial court's error was not harmless because under Code § 13.1-1021.1(C), the deed of trust was conclusive in its favor.[7]

For the following reasons, we agree with Loan Funder that the trial court erred in applying Code § 13.1-1021.1(B) rather than Code § 13.1-1021.1(C). However, as also discussed below, we hold that the trial court's error was harmless to the outcome in this case. Pursuant to the trial court's findings and the record, the deed of trust was invalid under Code § 13.1-1021.1(C).

I. The trial court erred by failing to apply Code § 13.1-1021.1(C).

A. Code § 13.1-1021.1(C), not Code § 13.1-1021.1(B), governs the deed of trust.

Loan Funder's argument requires this Court to interpret Code § 13.1-1021.1, a section of the Virginia Limited Liability Company Act (the LLC Act). This code section is titled, "Agency of members and managers." As a primary matter, this section states that each manager, but not each member, of a manager-managed LLC is "an agent of the limited liability company for the purpose of its business." Code § 13.1-1021.1(B)(1)–(B)(2).

Code § 13.1-1021.1(B) (subsection B) provides a set of rules governing unauthorized acts performed by LLC managers in manager-managed LLCs. Subsection B's rules hinge on whether an LLC manager's actually unauthorized actions are "for apparently carrying on in the ordinary course the [LLC's] business or business of the kind carried on by the [LLC]."[8] Code § 13.1-1021.1(B)(3), (B)(4). If they are, then the LLC is bound by its manager's actions unless "the person with whom the manager was dealing knew or had notice that the manager lacked

---

[7] Of note, Farm Life has not cross-appealed the trial court's denial of its slander of title counts, nor the trial court's declining to void the promissory note. Therefore, we do not consider these issues on appeal.

[8] In this opinion, we will use the phrase, "carrying on in the ordinary course the LLC's business" to refer to the broader statutory category additionally encompassing actions "carrying on . . . business of the kind carried on by the [LLC]" from § 13.1-1021.1.

authority." Code § 13.1-1021.1(B)(3).[9] On the other hand, if a manager's actually unauthorized actions do *not* appear to be for carrying on in the ordinary course the LLC's business, the LLC is not bound by those actions. Code § 13.1-1021.1(B)(4).[10]

Code § 13.1-1021.1(C) (subsection C) sets forth agency rules applicable to instances in which members or managers "sign and deliver any instrument transferring or affecting the limited liability company's interest in real property." First, an LLC's articles of organization may be written to limit the ability of an LLC manager to bind the LLC in such transfers. Code § 13.1-1021.1(C). Second, in the absence of such a limitation, an instrument signed or delivered

---

[9] Code § 13.1-1021.1(B)(3) reads as follows:

> An act of a manager, including the signing of an instrument in the limited liability company name, for apparently carrying on in the ordinary course the limited liability company business or business of the kind carried on by the limited liability company, binds the limited liability company, *unless* the manager had no authority to act for the limited liability company in the particular matter *and* the person with whom the manager was dealing *knew or had notice* that the manager lacked authority; and

(Emphases added).

[10] Code § 13.1-1021.1(B)(4) reads as follows:

> An act of a manager *which is not* apparently for carrying on in the ordinary course the limited liability company business or business of the kind carried on by the limited liability company *binds the company only if the act was authorized* in accordance with § 13.1-1024.

(Emphases added).

by an LLC manager "shall be conclusive in favor of a person who gives value without knowledge of the lack of authority of the person signing and delivering the instrument." *Id.*[11]

Subsection C applies when a manager signs a deed of trust encumbering the LLC's property. This is so because the LLC Act defines "transfer," an operative term in Code § 13.1-1021.1(C), to include "an encumbrance including a mortgage or security interest." Code § 13.1-1002; *see also Parrish v. Callahan*, 78 Va. App. 630, 639 (2023) (a deed of trust conveys a security interest to a trustee). Further, where subsection C applies, subsection B does not apply. This is clear because subsection B explicitly states that it is "[s]ubject to subsection C." Code § 13.1-1021.1(B).

Here, the trial judge explicitly ruled that Loan Funder was not entitled to rely on Lu's authority to perform the relevant transaction under subsection B of Code § 13.1-1021.1 but did not render any ruling as to Loan Funder's ability to rely under subsection C. We agree with Loan Funder that the trial court erred in relying on subsection B to the exclusion of subsection C. In signing a deed of trust encumbering Farm Life's property, Lu "sign[ed] . . . [an] instrument transferring or affecting the limited liability company's interest in real property." Code § 13.1-1021.1(C); *see also* Code § 13.1-1002 (defining "transfer"); Code § 13.1-1021.1(B) (subsection B is "[s]ubject to subsection C."). Therefore, it was error for the trial court to apply Code § 13.1-1021.1(B) and not Code § 13.1-1021.1(C) in this case.

---

[11] Code § 13.1-1021.1(C) reads:

> Unless the articles of organization limit their authority, any member in a member-managed limited liability company, or any manager in a manager-managed limited liability company, may sign and deliver any instrument transferring or affecting the limited liability company's interest in real property, which instrument shall be conclusive in favor of a person who gives value without knowledge of the lack of authority of the person signing and delivering the instrument.

B. Whether the trial court's judgment must be reversed depends on the meaning of "knowledge" in Code § 13.1-1021.1(C).

Our inquiry does not end with our holding that the trial court erred. In every case, this Court must assess whether an error was harmless before reversing the judgment of a trial court. *Commonwealth v. White*, 293 Va. 411, 420 (2017). "Absent an error of constitutional magnitude, 'no judgment shall be arrested or reversed' '[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" *Ferrara v. Commonwealth*, 299 Va. 438, 450 (2021) (quoting Code § 8.01-678). "Under the doctrine of harmless error, we will affirm the circuit court's judgment when we can conclude that the error at issue could not have affected the court's result." *Id.* (quoting *Forbes v. Rapp*, 269 Va. 374, 382 (2005)).

Here, Farm Life argues that the trial court's findings and the evidence compel the conclusion that, even under Code § 13.1-1021.1(C), Loan Funder was not permitted to rely on Lu's appearance as an agent of Farm Life because Loan Funder did not "give[] value without knowledge" of Lu's lack of authority. *See id.*[12]

First, Farm Life points to the trial court's finding of Lu's lack of actual authority. The trial court explained that Lu lacked actual authority to encumber the LLC's property with a deed of trust in order to fund a personal bakery project "unrelated to any of Farm Life's business." This finding is binding on this Court, as Loan Funder did not assign error to it. *Canales v. Orellana*, 67 Va. App. 759, 789 (2017) (en banc). Further, this finding is supported by the provisions of Farm Life's authentic operating agreement. The operating agreement said that no

---

[12] On brief, Farm Life makes a number of procedural default arguments that we need not reach because of our ultimate disposition in this case. For the same reason, Farm Life's "Motion to Dismiss Appeal," filed June 14, 2024, and held in abeyance pursuant to this Court's order dated January 23, 2025, is denied. *See Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) ("The doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (quoting *White*, 293 Va. at 419)).

transaction transferring all or substantially all of the LLC's assets outside of the ordinary course of business could be performed without the consent of members owning over half of the company. Lu only owned one seventh of the company and the transaction involved transferring the LLC's only substantial asset outside the ordinary course of business. *See* Code § 13.1-1002 (definition of "transfer").

Second, Farm Life highlights the trial court's finding that Lu was not "even apparently carrying on in the ordinary course of Farm Life's business" when Lu took the relevant actions. This finding is also unappealed and thus binding on this court, *Canales*, 67 Va. App. at 789, and is supported by the clear, aforementioned evidence that Farm Life's work bore no relation to the bakery business or the state of Florida. Finally, Farm Life points out that the record shows that Lu, in his attempt to prove his authority to act, provided Loan Funder with at least one document that was evidently flawed and legally ineffective.

Farm Life argues that given these findings, and this evidence, Loan Funder cannot be said to have "give[n] value without knowledge" of Lu's lack of authority. Code § 13.1-1021.1(C). For this reason, Farm Life argues, it was not bound by the deed of trust. *Id.*

In response, Loan Funder clearly takes the position that the term "knowledge" used in Code § 13.1-1021.1(C) should be read to mean "actual knowledge." Loan Funder points out that while subsection B conditions its rules with language about the ordinary course of the LLC's business, subsection C contains no such qualifying language. Additionally, Loan Funder argues that because actual knowledge is required, the trial court's findings compel that the judgment be reversed. This is because in ruling on the "slander of title" counts, the trial court rendered a binding, unappealed finding that Loan Funder's mens rea did not rise to the lower level of reckless disregard. *See Canales*, 67 Va. App. at 789.

Resolving the parties' dispute requires determining the meaning of "knowledge," as used in Code § 13.1-1021.1(C), a "pure question of law." *Bd. of Supervisors v. Cohn*, 296 Va. 465, 472 (2018) (quoting *Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007)). If "knowledge," as used in Code § 13.1-1021.1(C), means "actual knowledge," as Loan Funder argues, then we cannot say that the trial court's error was harmless.[13] This is because while RCN and Loan Funder possessed actual knowledge of Lu's lack of authority when they reviewed the original, genuine operating agreement, their subsequent review of false operating agreements precludes a finding, on appeal, that they remained actually aware of Lu's lack of actual authority.

If, on the other hand, "knowledge" includes "constructive knowledge," then this Court will consider whether the unchallenged findings and the evidence in this case compel the conclusion that Loan Funder had constructive knowledge of Lu's lack of authority. If they do, then the judgement will be affirmed. *See Ferrara*, 299 Va. at 450.

II. Code § 13.1-1021.1(C) should be read to incorporate the common law's notion of constructive knowledge as used in the doctrine of apparent authority.

As discussed, we must determine the meaning of the term "knowledge" as used in Code § 13.1-1021.1(C). To interpret the term "knowledge," this Court will examine the plain text of the statute, and, if an ambiguity exists in the plain text, apply the rules of statutory construction.

Here, after examining the plain text, we (A) conclude that the term "knowledge" contains an ambiguity such that this Court must interpret it. Next, applying a longstanding rule of statutory construction, we (B) conclude that Loan Funder's suggested reading of Code § 13.1-1021.1(C) would create a significant divergence from the common law in the case of the actions of LLC managers and members and that the text does not explicitly compel that divergence. Therefore, we hold that the term "knowledge" in Code § 13.1-1021.1(C) should be

---

[13] Given our ultimate disposition in this case, we need not determine whether such a ruling would require a remand for a new trial or the entry of judgment in Loan Funder's favor.

read to mean "constructive knowledge" as that term is understood in the relevant Virginia common law.

A. Code § 13.1-1021.1(C) contains an ambiguity requiring application of statutory interpretation rules because the term "knowledge" is reasonably susceptible to two meanings.

"The primary goal of the Court in interpreting statutes is to determine the General Assembly's intent." *Commonwealth ex rel. Fair Hous. Bd. v. Windsor Plaza Condo. Ass'n*, 289 Va. 34, 51 (2014) (quoting *Sheppard v. Junes*, 287 Va. 397, 403 (2014)). "To do this, we examine the language contained in the statute itself, if unambiguous, and apply its plain meaning." *Id.* "When a statute, as written, is clear on its face, [we] will look no further than the plain meaning of the statute's words." *Va. Dep't of Tax'n v. R.J. Reynolds Tobacco Co.*, 300 Va. 446, 455 (2022) (quoting *Commonwealth, Dep't of Tax'n v. Delta Air Lines, Inc.*, 257 Va. 419, 426 (1999)). "If [this C]ourt finds that the language of a statute is ambiguous, then it may consider factors other than the text itself." *Norfolk Dep't of Hum. Servs. v. Goldberg*, 81 Va. App. 667, 676 (2024). Statutory language can be ambiguous "if it admits of being understood in more than one way." *Gillespie v. Commonwealth*, 272 Va. 753, 757-58 (2006).

Here, the word "knowledge" in Code § 13.1-1021.1(C) is ambiguous because it "admits of being understood in more than one way." *Id.* On the one hand, courts will often interpret "knowledge" to mean actual knowledge. *See, e.g.*, *Sims v. Cunningham*, 203 Va. 347, 354 (1962) ("[T]he word 'knowledge' had been construed to mean more than mere information in the sense of hearsay reports, rumors and the like, which are not susceptible of use as evidence."); *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 185 (2022) ("[I]n this context, the word 'knowledge' means actual, subjective awareness of both the facts and the law."). But courts also often also interpret "knowledge" to mean "constructive knowledge." *See Conway v. Commonwealth*, 12 Va. App. 711, 715 (1991) (interpreting "known to the Commonwealth" in

Rule 3A:11 to refer to materials for which the Commonwealth's Attorney has constructive knowledge of the Commonwealth's possession thereof); *Unicolors*, 595 U.S. at 193 (Thomas, J., dissenting) ("A 'knowledge' requirement . . . often encompasses actual and constructive knowledge."); *Minser v. Collect Access, LLC*, 92 Cal. App. 5th 781, 792 (2023) ("In general, the use of the term 'knowledge' in a statute without further qualification 'encompasses both actual knowledge *and* constructive knowledge.'" (quoting *Tsasu LLC v. U.S. Bank Tr., N.A.*, 62 Cal. App. 5th 704, 718 (2021))); *People v. Wang*, 952 N.W.2d 334, 343 (Mich. 2020) ("[W]hen knowledge is an element of an offense, it includes both actual and constructive knowledge." (quoting *People v Perez-Deleon*, 568 N.W.2d 324, 327 (Mich. Ct. App. 1997))); *Blakemore v. Coleman*, 701 F.2d 967, 970 n.2 (D.C. Cir. 1983) (proposed jury instructions that "referred to the 'knowledge' of the defendants . . . could be read to include either actual or constructive knowledge"). *Cf. Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 185 (2020) (explaining that Congress's use of phrase "actual" before "knowledge" was not "redundant" because it worked to distinguish the term from "constructive knowledge").

Because the term "knowledge" can mean either actual or constructive knowledge depending on the context, there is an ambiguity to the meaning of the term "knowledge" in Code § 13.1-1021.1(C) for which employment of the tools of statutory interpretation is appropriate. *See Gillespie*, 272 Va. at 757-58; *Goldberg*, 81 Va. App. at 676.

> B.  Code § 13.1-1021.1(C) must be read consistently with the common law of apparent authority unless its text explicitly manifests an intent to diverge from those common law rules.

The General Assembly clearly possesses the power to alter or overrule the common law. Code § 1-200.  But it is a settled rule of statutory interpretation in Virginia that courts will not interpret statutes to overrule the common law except when statutory text clearly shows an intent to do so.  *See Herndon v. St. Mary's Hosp., Inc.*, 266 Va. 472, 476 (2003) ("[A] statutory

- 14 -

provision will not be held to change the common law unless the legislative intent to do so is plainly manifested. Therefore, a statutory change in the common law will be recognized only in that which is *expressly stated in the words of the statute or is necessarily implied by its language*." (emphasis added)) (citations omitted)); *see also Poole v. Commonwealth*, 73 Va. App. 357, 366 (2021) (quoting *Boyd v. Commonwealth*, 236 Va. 346, 349 (1988)) (quoting a similar rule). When statutory text does not plainly manifest such an intent, we read statutes to preserve the common law. *Siquina v. Commonwealth*, 28 Va. App. 694, 698 (1998) ("Unless it is clear from express language that the legislature intended to deviate from the common law, we will construe a statute 'as near to the reason of common law' as possible." (quoting *Wicks v. City of Charlottesville*, 215 Va. 274, 276 (1974))).

Here, the common law rule directly on point is the doctrine of apparent authority. "The general rule is that as between the principal and agent and third persons, the mutual rights and liabilities are governed by the apparent scope of the agent's authority." *Neff Trailer Sales, Inc. v. Dellinger*, 221 Va. 367, 370 (1980) (quoting *Wright v. Shortridge*, 194 Va. 346, 352 (1952)); *see also J. C. Lysle Milling Co. v. S. W. Holt & Co.*, 122 Va. 565, 571-72 (1918) (same); Code § 13.1-1021.1(B) (LLC managers are agents of the LLC for the purposes of their business).

An agent's apparent authority is limited to the authority that a reasonable person under the circumstances of a particular case would believe the agent possessed. *See Dere v. Montgomery Ward & Co.*, 224 Va. 277, 282 (1982) ("Whether an act is within the apparent scope of an agent's authority turns upon the question whether 'an ordinarily prudent person . . . would be justified in believing that he is authorized to perform the act.'" (quoting *Wright*, 194 Va. at 353)); *Neff Trailer Sales*, 221 Va. at 370 (same). As such, the apparent authority inquiry focuses on whether the third party possesses *constructive* knowledge of a limitation on an agent's authority, not whether the third party *actually* knows that the agent is unauthorized to act. *See*

*Morrison v. Commonwealth*, 37 Va. App. 273, 280 (2002) (defining "constructive knowledge" as referring to "circumstances where one reasonably should know"); 21A Michie's Jurisprudence, *Words and Phrases* (defining "constructive knowledge" as "knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person" (quoting *Mace v. Ford Motor Company*, 653 S.E.2d 660 (W. Va. 2007)); *see also Hawthorn Coal Corp. v. Blair*, 134 Va. 44, 48 (1922) ("[I]n the absence of knowledge, *actual or constructive*, on the part of parties entering into a contract with a general agent . . . of any limitation upon the authority of the agent, the parties may safely rely upon the *apparent authority* of an agent. . . ." (emphases added)).

Herein lies the potential divergence from the common law: Whereas under the common law, a party dealing with an agent is responsible for an agent's lack of authority within that party's constructive knowledge, Loan Funder's reading would mean that under Code § 13.1-1021.1(C), a party dealing with an LLC manager in certain real property contexts may safely rely on the manager's ability to do anything, on behalf of his principal, that the party does not *actually know* the manager is unauthorized to do. Such a reading is in clear derogation of the common law, so we will not adopt it unless it is "plainly manifested" as intended by the statutory text of Code § 13.1-1021.1(C).[14] *See Herndon,* 266 Va. at 476.

Here, there is no plain manifestation of a legislative intent to adopt Loan Funder's argued reading. The statutory text simply states that an LLC manager's actually unauthorized real property transfers are binding in favor of a third party who "gives value without knowledge." Code § 13.1-1021.1(C). As discussed previously, this language can mean either "actual" or

---

[14] We note that the LLC Act itself provides that the common law continues to apply to LLCs except where "displaced by particular provisions of this chapter." Code § 13.1-1001.1. We do not find this provision persuasive in either direction, as "displaced" could refer either to a manifest intention to displace the common law or could simply refer to the legislature's ability to overrule the common law.

"constructive knowledge" depending on the legal context in which it is used. *See Conway*, 12 Va. App. at 715; *Unicolors*, 595 U.S. at 193 (Thomas, J., dissenting); *Minser*, 92 Cal. App. at 792; *Wang*, 505 Mich. at 255; *Blakemore*, 701 F.2d at 970 n.2.

Because the legislature has not "plainly manifested" or "necessarily implied" a decision to diverge from the common law rule of constructive knowledge, we will read Code § 13.1-1021.1(C) not to "alter[] or change[]" the common law rules of apparent authority in the case of LLC managers' property transfers. *See Poole*, 73 Va. App. at 366 (quoting *Boyd*, 236 Va. at 349); *Siquina*, 28 Va. App. at 698. Consequently, we will read the term "knowledge" in Code § 13.1-1021.1(C) "'as near to the reason of common law' as possible," and interpret it to mean "constructive knowledge." *See Siquina*, 28 Va. App. at 698 (quoting *Wicks*, 215 Va. at 276).

> C. The rule against interpreting text to overrule the common law when not explicitly compelled by statutory text to do so is the best interpretive canon to apply in this case.

We note that alternate readings of the statute are possible. As suggested by Loan Funder, the fact that subsection B refers to the appearance of a manager's operation outside the "ordinary course" of the LLC's business, and that subsection C does not, might be interpreted to imply that "knowledge" in subsection C does not mean "constructive knowledge." Further, though not argued by Loan Funder, subsection B's use of the term "notice" could give rise to the same inference.

However, we are unpersuaded that the legislature intended a negative implication from its omission of this language in subsection C. *See Field v. Mans*, 516 U.S. 59, 70 (1995) (interpreting a provision in line with the common law after rejecting a statutory interpretation argument based solely on a negative inference derived from the omission of language used in a parallel subsection).

- 17 -

In addition to our primary reason, which is the foregoing analysis regarding the non-abrogation of the common law, support for our conclusion is found in the commentary of the drafters of § 301 of the Uniform Limited Liability Company Act, passed by the Uniform Law Commission (Commission) in 1996. Code § 13.1-1021.1 is substantively identical to § 301 of the Uniform Limited Liability Company Act.

First, in a comment to a later, revised version of the Uniform Limited Liability Company Act, the Commission wrote that in the relevant 1996 version, it had attempted to "provide for what might be termed 'statutory apparent authority by position' for" LLC members and managers, a doctrine that "dates back at least to the original Uniform Partnership Act." Unif. Ltd. Liab. Co. Act § 301(a) cmt. (Unif. L. Comm'n 2006). "This notion," the Commission continued, "codifies the common law notion of apparent authority by position." *Id.* While these statements do not explicitly refer to Virginia common law, they provide some further indication that Code § 13.1-1021.1, a substantively identical section, was intended to be compatible with rather than repugnant to common law notions of apparent authority.

Second, the Commission's Comment to the 1996 act indicates that the Commission did not view subsection C of § 301 (identical to Code § 13.1-1021.1(C)) as shifting the balance towards third parties in the real property context. The Comment's discussion of subsection C contains no discussion of an elevated mens rea or "actual knowledge" standard. Unif. Ltd. Liab. Co. Act § 301 cmt. (Unif. L. Comm'n 1996). Instead, the Comment's discussion of subsection C is solely focused on the subsection's first clause, which permits LLCs to place restrictions on managers' authority in their articles of organization. *Id.* (noting that subsection C's provisions are an "important exception[]" to the general unavailability of means for LLCs to avoid being bound by their managers' unauthorized acts). In our view, the focus of this Comment and its omission of any language suggesting a heightened "actual knowledge" standard are notable.

Finally, we find support in the rules against interpreting statutes to create an absurdity or a manifest injustice. *See Butler v. Fairfax Cnty. Sch. Bd.*, 291 Va. 32, 37 (2015) ("[W]e must give effect to the legislature's intention as expressed by the language used unless a literal interpretation of the language would result in a manifest absurdity." (quoting *Payne v. Fairfax Cnty. Sch. Bd.*, 288 Va. 432, 436 (2014))); *Wertz v. Grubbs*, 245 Va. 67, 72 (1993) ("[I]f [a] statute [is] open to two constructions, [a] court will not give it construction that would result in injustice[]." (citing *Harvey v. Hoffman*, 108 Va. 626, 629 (1908))). Reading "knowledge" in Code § 13.1-1021.1(C) to mean "actual knowledge" would excuse third parties even when they fail to exercise minimum care, effectively holding LLCs strictly liable (in a civil sense) for the actions of a manager who conducts unpermitted real estate transfers in secret. It would excise reasonableness from the inquiry. Because the legislature did not manifestly intend to abrogate the common law to reach such a result, we will not read Code § 13.1-1021.1(C) to do so.

Therefore, in sum, applying the rules of statutory construction, we hold that "knowledge" as used in Code § 13.1-1021.1(C) should be read to mean "constructive knowledge" as that term is used in Virginia's common law of apparent authority.

III. Pursuant to the trial court's factual findings and the record in this case, Loan Funder had constructive knowledge of Lu's lack of authority under Code § 13.1-1021.1(C).

On brief, Farm Life argues that if Code § 13.1-1021.1(B) does not apply, the trial court's factual findings and the evidence are sufficient to sustain its verdict under Code § 13.1-1021.1(C). Given that we hold that "knowledge" in Code § 13.1-1021.1(C) should be read "'as near to the reason of common law' as possible," *Siquina*, 28 Va. App. at 698 (quoting *Wicks*, 215 Va. at 276), we must ask whether the record in this case, combined with the trial court's unappealed findings, permit the deed of trust to bind Farm Life under the common law's doctrine of apparent authority.

After careful review of the common law, the trial court's findings, and the record, we hold that Farm Life was not bound by Lu's signing the deed of trust. Our conclusion follows from apparent authority precedent related to divergences from the ordinary course of business, the role of sophisticated business entities, the performance of acts that cast doubt upon an agent's authority, and representations made by agents without the permission of the principal.

A. Applicable Common Law Principles

First, under the common law of apparent authority, a third party is generally barred from citing its reliance on an agent's appearance of authority when the agent has evidently diverged from the ordinary purposes and activities of his or her business. According to the Third Restatement, a "third party should . . . consider whether the proposed transaction appears to be reasonably related to the principal's known business. If material doubt arises[,] . . . ordinarily it is reasonable to inquire further about the extent of the agent's authority." Restatement (Third) of Agency § 2.03 (Am. L. Inst. 2006). Further, "[s]ome transactions by their nature should strike a dissonant chord for a reasonable third party," due to "the nature of the principal or its activities." *Id.* One such example is "[a] transaction that lacks any evident connection with a principal's interests," as such a transaction "is on its face inconsistent with the fiduciary character of the relationship between principal and agent." *Id.*

Our Supreme Court has directed that the "ordinarily prudent person" whose perspective matters for purposes of the apparent authority analysis is one with "a reasonable knowledge of the usages of the business in which the agent is engaged." *Neff Trailer Sales*, 221 Va. at 370 ("An act is within the apparent scope of an agent's authority if, in view of the character of his actual and known duties, an ordinarily prudent person, having a reasonable knowledge of the usages of the business in which the agent is engaged, would be justified in believing that he is authorized to perform the act in question." (quoting *Wright*, 194 Va. at 353)). In the federal

Fourth Circuit case from which Virginia originally adopted this principle, it can be seen that an agent's apparent divergence from the ordinary course of business can preclude justifiable reliance on the agent's authority to perform an act. *Richmond Guano Co. v. E. I. Du Pont de Nemours & Co.*, 284 F. 803, 807 (4th Cir. 1922) (holding buyer was not permitted to rely on agent's authority to sell principal's nitrate in part because the reputation of the agent company was not as a seller, but as a stevedore and shipper).

Second, while an everyday person cannot be expected to gain an understanding of the contours of a seller's business, it is generally reasonable for a sophisticated corporate entity to gain at least a basic understanding thereof. *See Giordano v. Atria Assisted Living, Va. Beach, LLC*, 429 F. Supp. 2d 732, 740 (E.D. Va. 2006) (considering fact that a party was a "sophisticated, corporate client" in holding reliance on apparent agency unreasonable); *Harris v. Dunham*, 203 Va. 760, 767 (1962) ("business acumen" of a party relevant to reasonableness of that party's reliance on the representations of another).

Third, in Virginia, "[o]ne who deals with an agent does so at his own peril and has the duty of ascertaining the agent's authority." *Kern v. Freed Co.*, 224 Va. 678, 680 (1982). Therefore, an agent's actions that "cast doubt upon" an agent's authority can render apparent authority "inapposite." *Dere*, 224 Va. at 282. One example is the attempt of an agent to transfer his principal's real property—at the very least, such an attempt accentuates the impetus for clearly establishing an agent's authority. *Cf. Mosell Realty Corp. v. Schofield*, 183 Va. 782, 791 (1945) ("Unless otherwise agreed, authority to act in the principal's business does not include authority to sell the principal's interests in land, unless the business entrusted to the agent includes the selling of land.").

Fourth, not all claims of authority by an agent can suffice to confer apparent authority upon himself. Our case law indicates that an agent's acts establishing apparent authority must be

traceable to actions of the principal; the principal must represent the agent as authorized to perform an action or must permit the agent to do so. *Neff Trailer Sales*, 221 Va. at 370 (apparent authority is "that authority which the principal has held the agent out as possessing, or which he has permitted the agent to represent that he possesses." (quoting *Wright*, 194 Va. at 353)); *see also Sanchez v. Medicorp Health Sys.*, 270 Va. 299, 303 (2005) (same).

B.  Pursuant to the unchallenged findings and the evidence, Loan Funder had constructive knowledge of Lu's lack of authority.

Here, considering all of these principles, under the common law's notion of apparent authority, the evidence and unchallenged factual findings direct that Loan Funder had constructive knowledge of Lu's lack of authority.  First, the stark, apparent divide between Farm Life's day-to-day activities and the purpose for which Lu sought to encumber its real property precluded Loan Funder from relying on Lu's appearance of authority without further inquiry. *See* Restatement (Third) of Agency, *supra*, § 2.03; *Neff Trailer Sales*, 221 Va. at 370; *Richmond Guano Co.*, 284 F. at 807.  Loan Funder, aware that an LLC manager was seeking to obtain a loan to perform business bearing no relation to the principal's type of business or geographic location, was on notice that they were not dealing with an ordinary LLC manager and was responsible for dealing with him as such. *Id.*

Second, to the extent to which Loan Funder could have remained wholly unaware of Lu's divergence from Farm Life's ordinary course of business and instead focused solely on the value of the collateral, such a sophisticated corporate entity was not permitted to do so. *Neff Trailer Sales*, 221 Va. at 370 (apparent authority applicable if "an ordinarily prudent person, *having* a reasonable knowledge of the usages of the business in which the agent is engaged, would be justified in believing that he is authorized to perform the act in question." (emphasis added) (quoting *Wright*, 194 Va. at 353)); *Harris*, 203 Va. at 767; *Giordano*, 429 F. Supp. 2d at 740

- 22 -

(status as "sophisticated, corporate client" as relevant to reasonableness of reliance on apparent agency).

Third, several aspects of Lu's actions outside of his divergence from Farm Life's ordinary business should have further cast doubt on Lu's ability to act on its behalf. In interacting with Lu at its own risk, *see Kern*, 224 Va. at 680, Loan Funder, a sophisticated party, faced an agent who (1) appeared to be operating outside the ordinary scope of his principal's business, (2) was attempting to transfer his principal's real property, its only substantial asset, (3) initially provided an operating agreement showing his lack of authority to perform the relevant transaction alone, and (4) attempted to counteract the effect of that operating agreement with an error-ridden document with obvious legal deficiencies. Given this combination of circumstances, a reasonably prudent sophisticated corporate lender would not have been justified in believing, without further inquiry, that Lu was authorized to take out the deed of trust on Farm Life's behalf. *See id.* ("One who deals with an agent does so at his own peril and has the duty of ascertaining the agent's authority."); *Dere*, 224 Va. at 281-82 (no apparent authority where principal's act "cast doubt upon [the agent's] continuing authority to bind [the principal]"); *Mosell Realty Corp.*, 183 at 791 (general presumption that agency does not include power to sell a principal's real property); *Harris*, 203 Va. at 767 (sophistication of relying party is relevant).

Fourth, Lu's claims of authority in no way represented the will or the permission of his principal, as is required to create apparent authority. Farm Life never represented Lu as the LLC's majority owner and never permitted him to represent himself as such. All that Farm Life did was approve an operating agreement that conferred Lu a one-seventh ownership share of the property and denied him the right to make such a unilateral transfer of its only substantial asset outside the ordinary course of business. Therefore, any impression of authority that Loan Funder gained from Lu's misrepresentations was distinct from any "authority which the principal . . .

- 23 -

held [Lu] out as possessing, or which [Farm Life] . . . permitted [Lu] to represent that he possesse[d]." *Neff Trailer Sales*, 221 Va. at 370 (quoting *Wright*, 194 Va. at 353).

Finally, we acknowledge that Loan Funder faced a difficult situation in this case in that Lu apparently attempted to assuage the lender's concerns through the use of forgery.[15] An agent's criminal acts and forgeries, however, generally do not bind the principal. *See Aetna Ins. Co. v. Carpenter*, 170 Va. 312, 326 (1938) (rejecting proposition that "a criminal act done by an agent without the knowledge and authority of his principal, and without subsequent ratification, [was] within the scope of the agent's authority"); *see also* 8B Michie's Jurisprudence, *Forgery* § 5 ("The rule, that where one of two innocent persons must suffer, he who puts it in the power of another to do the wrong must bear the loss, has no application in the case of forged instruments." (citing *Barbee v. Amory*, 46 S.E. 59, 61 (W. Va. 1928))).

CONCLUSION

In sum, we hold as follows: The trial court erred by relying on Code § 13.1-1021.1(B) instead of Code § 13.1-1021.1(C). However, this error was harmless to the outcome of the case because the trial court's findings and the evidence in the record compel the conclusion that Farm Life was not bound by the relevant deed of trust under the standards set forth in Code

---

[15] Forgery is defined as "the false making or materially altering with intent to defraud, of any writing which, if genuine, might apparently be of legal efficacy, or the foundation of legal liability." *Morris v. Commonwealth*, 20 Va. App. 1, 3 (1995) (quoting *Fitzgerald v. Commonwealth*, 227 Va. 171, 173 (1984)). Viewed in the light most favorable to Farm Life, the evidence indicates that Lu or his representative signed the names of Farm Life's other managers or members on the false amendment to the operating agreement.

§ 13.1-1021.1(C), read to preserve the common law of apparent authority.[16] Therefore, we will affirm the judgment of the trial court.

*Affirmed.*

---

[16] In its second assignment of error, Loan Funder argues that the trial court also erred in ruling against Loan Funder on its counterclaim alleging breach of a note. Loan Funder argues that because the note was secured by the deed of trust, it, too, "affects" Loan Funder's interest in real property and is thus governed by Code § 13.1-1021.1(C). Pursuant to the foregoing analysis, however, Lu lacked authority under either Code §§ 13.1-1021.1(C) or 13.1-1021.1(B) in this case. Therefore, we need not determine for the purposes of this appeal which section governed Lu's signing of the promissory note. *See Butcher*, 298 Va. at 396 (best and narrowest grounds principle).